```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
THE NATIONAL RETIREMENT FUND and the
BOARD OF TRUSTEES OF THE NATIONAL
RETIREMENT FUND, each on behalf of the
Legacy Plan of the National Retirement Fund,
                                                                    OPINION & ORDER
                                      Plaintiffs,
                                                                    No. 21-CV-4987 (CS)
        - against -

THE RUPRECHT COMPANY,

                                      Defendant.
---------------------------------------------------------------x
```

Appearances:
Ronald E. Richman
Andrew Lowy
Schulte Roth & Zabel LLP
New York, New York
*Counsel for Plaintiffs*

Aaron Tulencik
Tulencik Law Firm LLC
Columbus, Ohio
*Counsel for Defendant*

Seibel, J.

Before the Court is the motion for summary judgment of Plaintiffs The National Retirement Fund and the Board of Trustees of the National Retirement Fund, each on behalf of the Legacy Plan of the National Retirement Fund (together, "Plaintiffs" or the "Fund"), (ECF No. 39), and the cross-motion for summary judgment of Defendant The Ruprecht Company ("Defendant" or "Ruprecht"), (ECF No. 43). For the following reasons, the Fund's motion is GRANTED and Ruprecht's cross-motion is DENIED.

I.    **BACKGROUND**

   A.    **Facts**

The following facts are based on the parties' Local Civil Rule ("LR") 56.1 Statements, (ECF No. 42 ("Fund 56.1 Stmt."); ECF No. 46 ("Ruprecht 56.1 Stmt."); ECF No. 49 ("Ruprecht 56.1 Resp."); ECF No. 51 ("Fund 56.1 Resp.")), and the evidentiary materials submitted by the parties, and are undisputed unless otherwise noted.[1]

The Fund is a Taft-Hartley trust fund that sponsors and administers the Legacy Plan of the National Retirement Fund (the "Plan"), a multi-employer pension plan, through its Trustees.

---

[1] The Fund's response to Defendant's 56.1 Statement is deficient for two reasons. (*See* Fund 56.1 Resp.)  First, it fails to comply with LR 56.1, which requires the party opposing summary judgment to include "correspondingly numbered paragraph[s] responding to each numbered paragraph in the statement of the moving party," LR 56.1(b), and to support each such paragraph with "citation to evidence that would be admissible," *id.* 56.1(d).  It further provides that if the non-moving party fails to specifically controvert a statement of the moving party, that statement is deemed admitted. *Id.* 56.1(c). None of Plaintiffs' denials cite to admissible record evidence.  Many simply state that the Fund "denies knowledge or information sufficient to form a belief as to the truth of the allegations," contained in Defendant's 56.1 Statement, (*see, e.g.*, Fund 56.1 Resp. ¶¶ 14-15, 17-19, 21, 25, 39), or that the Fund "denies the allegations asserted" in whole or in part, (*see, e.g.*, *id.* ¶¶ 23-24, 27-28, 31, 38, 54-58).

A properly asserted fact is not considered disputed if a party states that it does not have knowledge sufficient to respond.  *See* LR 56.1(c) (each paragraph in a Rule 56.1 Statement "will be deemed to be admitted . . . unless specifically controverted"); *Walker v. City of N.Y.*, 63 F. Supp. 3d 301, 306 n.4 (E.D.N.Y. 2014) (denial of knowledge or information does not suffice to controvert a fact) (collecting cases), *aff'd*, 621 F. App'x 74 (2d Cir. 2015) (summary order).  Plaintiffs had the opportunity to take discovery, and any properly supported facts in Defendant's 56.1 Statement that Plaintiffs failed to properly address are deemed undisputed.  *See* Fed. R. Civ. P. 56(e)(2); *see also Scarpinato v. 1770 Inn, LLC*, No. 13-CV-955, 2015 WL 4751656, at *2 n.3 (E.D.N.Y. Aug. 11, 2015) (response that plaintiff "'denies possessing knowledge or information sufficient to form a belief as to the truth or the veracity' of [the opposing party's] statements" is "flatly inappropriate" after discovery has concluded).

Second, Plaintiffs' response to Defendant's 56.1 Statement fails to comply with item 2.C.i of my individual practices, which requires the opposing party to reproduce each entry in the moving party's Rule 56.1 Statement before setting out its response thereto.  Plaintiffs' failure to reproduce Defendant's statements defeats the purpose of my individual practice, which is designed to prevent the Court from having to go back and forth between the Rule 56.1 Statement and the response.

(Ruprecht 56.1 Resp. ¶¶ 1-3.) Prior to 2014, Ruprecht was obligated to contribute to the Fund on behalf of certain of its employees, pursuant to a collective bargaining agreement ("CBA"). (*Id.* ¶ 4.) On November 1, 2014, Ruprecht withdrew from the Fund. (*Id.* ¶ 5.)

Any such withdrawal triggers liability for the withdrawing party, and that withdrawal liability is calculated by the Fund. 29 U.S.C. § 1382. Before its withdrawal, Ruprecht requested that the Fund provide it with estimates for its withdrawal liability for the 2012 and 2013 plan years, which the Fund did. (Ruprecht 56.1 Stmt. ¶¶ 6-9.) Those estimates were calculated using an interest rate of 7.25% to determine the present value of vested benefits and employer annual contribution obligations. (*Id.* ¶ 10.) Shortly thereafter, the Fund sent Ruprecht a "Notice of Critical Status" indicating that the Fund was projected to have accumulated a funding deficiency during the next 10 plan years. (*Id.* ¶¶ 11-13; *see* ECF No. 44-6.) In September 2014, Ruprecht prepared internal withdrawal liability calculations in anticipation of a possible 2014 withdrawal, using information contained in the aforementioned estimates the Fund had provided for the 2012 and 2013 plan years. (Ruprecht 56.1 Stmt. ¶¶ 14-17.)

In December 2014, as part of negotiations for the sale of Ruprecht stock, Ruprecht and the buyer executed an agreement establishing an escrow account from which to pay Ruprecht's withdrawal liability. (*See id.* ¶¶ 18-21; Ruprecht 56.1 Resp. ¶ 6; ECF No. 41-1 ("Escrow Agreement").) The Escrow Agreement set aside $2,500,000 "to pay the assessed withdrawal liability to the . . . Fund" and contemplated that any such payment would be a lump sum, *i.e.*, that "the Escrow Agent shall release from the . . . Escrow Account to the . . . Fund the amount of the Withdrawal Liability Notice, and the . . . Escrow Amount shall be reduced to the extent thereof . . . ." (Escrow Agreement at 1, 5.) It also contemplated that if Ruprecht contested the

withdrawal liability, it would pay the undisputed amount while the disputed amount remained in escrow.  (*See id.* at 3-4.)

Sometime in 2013, the Fund replaced its longtime actuary Buck Consultants with Horizon Actuarial Services LLC ("Horizon").  (Ruprecht 56.1 Stmt. ¶¶ 29-30.)  In June 2014, unbeknownst to Ruprecht, Horizon adjusted the interest rates used to determine both withdrawal liability and the Fund's minimum funding requirements.  (*Id.* ¶ 34.)  As to the former, it reduced the interest rate used to calculate withdrawal liability from 7.25% to 3.00-3.31%, and as to the latter it raised the interest rate used to calculate minimum funding requirements from 7.25% to 8.00%.  (*Id.* ¶ 35.)  Horizon also decided to apply these interest rate changes retroactively to December 31, 2013, the measurement date the Fund was legally obligated to use to calculate Ruprecht's withdrawal liability.  (*Id.* ¶ 37.)  That retroactive application increased Ruprecht's withdrawal liability by over $5.5 million.  (*Id.* ¶ 38.)

In January 2015, the Fund assessed Ruprecht with withdrawal liability in the amount of $7,641,914, to be paid in eighty quarterly installments of $99,323.52 each (the "Original Assessment").  (Ruprecht 56.1 Resp. ¶ 8.)  Approximately one month later, Ruprecht amended the Escrow Agreement to provide for quarterly disbursements, *i.e.*, "periodic payments from the Pension Escrow Account."  (ECF No. 41-2 ("Escrow Agreement Amendment") at 1; Ruprecht 56.1 Resp. ¶ 10.)  Pursuant to that amendment, Ruprecht instructed its escrow agent to make payments to Plaintiffs on a quarterly basis.  (Ruprecht 56.1 Resp. ¶ 10.)  Because it was paying in installments rather than in full, interest accrued on the outstanding amount.  (*See* Ruprecht 56.1 Stmt. ¶¶ 26, 54.)

On November 24, 2015, Ruprecht filed for arbitration challenging its withdrawal liability under the Original Assessment.  (Ruprecht 56.1 Resp. ¶ 11; *see* ECF No. 48-1.)  Around or about

the same time, the Fund was engaged in arbitration with Metz Culinary Management, Inc., ("Metz"), another employer that also withdrew from the Fund in 2014, over Metz's withdrawal liability. (Ruprecht 56.1 Resp. ¶¶ 12-13.) Metz argued that the Fund could not use the lower interest rate assumption chosen by Horizon in 2014 for calculating withdrawal liability for employers that withdrew during that year. (*Id.* ¶ 13.) The arbitrator ruled in favor of Metz, and the Fund filed a lawsuit in this Court to vacate the arbitral award, (*id.* ¶ 15), which resulted in the arbitrator being reversed and the interest rate selected by Horizon to calculate Metz's withdrawal liability being upheld, (*id.* ¶ 16). Specifically, District Judge Valerie Caproni determined that ERISA does not "prohibit a plan's actuary from selecting the withdrawal liability interest rate assumption after the Measurement Date." *Nat'l Ret. Fund. v. Metz Culinary Mgmt., Inc. (Metz I)*, No. 16-CV-2408, 2017 WL 1157156, at *5 (S.D.N.Y. Mar. 27, 2017), *vacated and remanded*, 946 F.3d 146 (2d Cir. 2020).[2] Metz appealed that decision to the Second Circuit, (Ruprecht 56.1 Resp. ¶ 17), which reversed Judge Caproni and determined that "the assumptions and methods used to calculate the interest rate assumption for purposes of withdrawal liability must be those in effect as of the Measurement Date," *Nat'l Ret. Fund v. Metz Culinary Mgmt., Inc. (Metz II)*, 946 F.3d 146, 151 (2d Cir. 2020).

In January 2020, following the Second Circuit's decision in *Metz II*, Ruprecht pursued the *Metz* issue – *i.e.*, the propriety of the interest rate used to calculate its withdrawal liability – in its arbitration with the Fund. (Ruprecht 56.1 Resp. ¶ 20.) The Fund contended that the arbitrator should not address the issue pending its petition for certiorari with the United States Supreme Court. (Ruprecht 56.1 Stmt. ¶ 44.) After that petition was denied on October 5, 2020,

---

[2] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

(*id.* ¶ 47), the Fund issued a revised assessment to Ruprecht (the "Revised Assessment") using the interest rate that the Second Circuit in *Metz II* held was proper.  (Ruprecht 56.1 Resp. ¶ 21.)  The Revised Assessment reduced Ruprecht's withdrawal liability from $7,641,914, (*id.* ¶ 8), to $2,160,216, (*id.* ¶ 22).  That sum resulted in an updated payment schedule of twenty-seven quarterly payments that totaled $2,664,072.91, $503,856.92 of which was interest.  (Ruprecht 56.1 Stmt. ¶ 52.)  The Fund calculated that under the Revised Assessment, Ruprecht owed it four additional liability payments of $99,323.52 each, due on December 1, 2020, March 1, 2021, June 1, 2021, and September 1, 2021.  (Ruprecht 56.1 Resp. ¶¶ 23-24.)  At the time the Revised Assessment was issued, Ruprecht had already paid the Fund a total of $2,284,440.96, well in excess of the $2,160,216 in principal called for by the Revised Assessment.  (Ruprecht 56.1 Stmt. ¶¶ 51, 53.)

Apparently in the belief that it should not have to pay anything further because it had been prepared back in 2015 to pay a lump sum that would have covered its liability had the Fund correctly calculated it, (*id.* ¶¶ 54-56; Ruprecht 56.1 Resp. ¶ 34), Ruprecht did not make the first quarterly payment due on December 1, 2020, (Ruprecht 56.1 Resp. ¶ 25).  The Fund sent Ruprecht a letter dated February 3, 2021, noting that it had not received the December payment and that the outstanding amount would accumulate interest on a daily basis until the Fund received payment.  (*Id.* ¶ 26.)  Ruprecht responded on February 18, 2021, stating that it would not furnish the missed payment and alleging that the Fund owed Ruprecht money for the interest the Fund had collected to date on the quarterly installments that Ruprecht had previously paid pursuant to the Original Assessment.  (*Id.* ¶ 27.)  The Fund responded on March 26, 2021, maintaining that any challenge to the Revised Assessment had to be handled through the ongoing arbitration, and that Ruprecht had an obligation to pay the quarterly withdrawal liability

6

payments to the Fund even while challenging the Revised Assessment.  (*Id.* ¶ 28.)  The Fund also noted that as of March 26, it had not received the outstanding December 1, 2020 quarterly payment or the next payment that had been due on March 1, 2021.  (*Id.* ¶ 29.)  In that same letter, the Fund advised Ruprecht that it would file an action in federal court to collect the missed quarterly withdrawal liability payments, plus interest, liquidated damages, and attorneys' fees, if Ruprecht continued to withhold the quarterly payments.  (*Id.* ¶ 30.)

The Fund then followed through, filing this action to collect the missed payments and statutory damages on June 4, 2021.  (*Id.* ¶ 31.)  At that time, Ruprecht had missed its payments due on December 1, 2020, March 1, 2021, and June 1, 2021, but had paid $2,284,440.96 in withdrawal liability.  (*Id.* ¶ 32.)  According to the Fund, $1,801,347.64 of that amount represented principal and $483,093.32 represented interest.  (*Id.*)[3]  In the Answer it filed on August 9, 2021, Ruprecht maintained that it did not owe any additional withdrawal liability

---

[3] In response to paragraph 32 of the Fund's 56.1 Statement, Ruprecht purports to "admit[] only that at the time the Fund filed the Complaint, Ruprecht had already submitted payments to the Fund totaling 2,284,440.96, a figure over and above the amount listed in the October 16, 2020 revised assessment," (Ruprecht 56.1 Resp. ¶ 32), citing a letter filed by its counsel on May 5, 2022, (*see* ECF No. 34), and a declaration submitted by its owner, Walter Sommers, (*see* ECF No. 44 ("Sommers Decl.")), both of which contain the same language, (*see* ECF. No. 34 at 1-2; Sommers Decl. ¶¶ 57-64).  In so doing, Ruprecht is "improperly interject[ing] arguments and/or immaterial facts in response to facts asserted by [Plaintiffs]," *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014), rather than directly responding to the Fund's assertion as to which portion of the $2,284,440.96 represented principal and which portion represented interest.  Accordingly, Ruprecht "fails to comply with the spirit, if not the letter of [Rule 56.1]" by "speaking past . . . asserted facts without specifically controverting those same facts."  *Id.*

Ruprecht's own 56.1 Statement freely states that it paid the Fund $2,284,440.97.  (Ruprecht 56.1 Stmt. ¶ 53.)  The Court can discern no reason for Ruprecht to admit that figure while refusing to either admit that the Fund's principal and interest breakdown of that sum is accurate or provide alternative principal and interest figures supported by admissible evidence, other than to elide the fact that the amount of principal paid by Ruprecht at the time the Fund issued the Revised Assessment was less than the amount of principal outstanding pursuant to that assessment.  (*See* Ruprecht 56.1 Stmt. ¶¶ 52-53; Ruprecht 56.1 Resp. ¶ 32.)

7

payments because it had "already paid the Fund $2,304,864.29" and because it had been "prepared to make a lump sum payment," but did not do so because the Fund had not "used the correct 7.25% interest rate in its initial assessment . . . ." (*Id.* ¶ 34; *see* ECF No. 9 ¶¶ 41-44, 60.) Ruprecht then missed its final remaining payment due on September 1, 2021. (Ruprecht 56.1 Resp. ¶ 33.)

On February 18, 2022, Ruprecht made all four withdrawal liability payments it missed – *i.e.*, the payments it did not tender when originally due on December 1, 2020, March 1, 2021, June 1, 2021, and September 1, 2021. (*Id.* ¶¶ 23-24, 35.) Pursuant to the Fund's trust agreement and collections policy, those payments accrued interest at a rate of 1% per month (or part thereof), non-compounded, and incurred liquidated damages at "an amount equal to the greater of the interest on the delinquent contributions or twenty percent (20%) of the delinquent contributions." (ECF No. 41-5 at 3; *see* Ruprecht 56.1 Resp. ¶ 36.) The Fund has not waived any of those amounts and contends that Ruprecht has not paid it interest in the amount of $40,656.15, liquidated damages in the amount of $75,926.39, and its attorneys' fees. (Ruprecht 56.1 Resp. ¶¶ 37-38.) Ruprecht denies that it owes those amounts, (*id.* ¶ 38), and contends that the Fund has received approximately $504,000 in interest payments to which it would not have been entitled had it issued a lawful assessment originally, (Ruprecht 56.1 Stmt. ¶ 58).

**B.  Procedural History**

On June 4, 2021, the Fund filed its Complaint with this Court, asserting claims for unpaid withdrawal liability, interest, liquidated damages, attorneys' fees, and injunctive relief. (*See* ECF No. 1 ("Compl.") ¶¶ 61-68.) Defendant filed its Answer on August 9, 2021. (*See* ECF No. 9). I subsequently held an initial conference on September 27, 2021, at which I entered a case management plan, (*see* Minute Entry dated Sept. 27, 2021), which was subsequently amended,

(*see* ECF No. 19). On March 10, 2022, I referred this case to Magistrate Judge Andrew E. Krause for settlement. (ECF No. 25.) The parties were ultimately unable to settle, and the instant motions followed.

## II.  LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1).  Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

This same standard applies to cross-motions for summary judgment. *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001); *C & A Carbone, Inc. v. County of Rockland*, No. 08-CV-6459, 2014 WL 1202699, at *5 (S.D.N.Y. Mar. 24, 2014).  Generally, in deciding cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales*, 249 F.3d at 121; *see Chartis Seguros Mex., S.A. de C.V. v. HLI Rail & Rigging, LLC*, 3 F. Supp. 3d 171, 179 (S.D.N.Y. 2014).  But where, as here, the motion and cross-motion seek a determination of the same issues, the Court can consider them together. *Chartis Seguros*, 3 F. Supp. 3d at 179; *Royal & Sun All. Ins., PLC v. E.C.M. Transp., Inc.*, No. 14-CV-3770, 2015 WL 5098119, at *2 (S.D.N.Y. Aug. 31, 2015).

**III.     DISCUSSION**

The parties have each moved for summary judgment with regard to the four Revised Assessment withdrawal liability payments that Ruprecht did not pay until after this suit was filed.  (*See* Ruprecht 56.1 Resp. ¶¶ 32-35.)  Plaintiffs contend that they are entitled to mandatory statutory damages consisting of interest, liquidated damages, and attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g)(2) because Ruprecht was delinquent in making those payments prior to the commencement of the instant action.  (*See* ECF No. 40 ("Ps' Mem.") at 8-10.)  Defendant maintains that it is entitled to the refund of those four payments, with interest, either because it is inequitable for the Fund to retain them or because the Fund's claim is not colorable.  (*See* ECF No. 45 (D's Mem.") at 13-16.)

This dispute falls under the Employee Retirement Income Security Act of 1974 ("ERISA").  "Congress enacted ERISA in 1974 with the purpose of ensuring that employees and their beneficiaries would not be deprived of anticipated benefits from their private retirement pension plans."  *Mar-Can Transp. Co., Inc. v. Loc. 854 Pension Fund*, No. 20-CV-8743, 2022 WL 35588, at *1 (S.D.N.Y. Jan. 4, 2022).  Congress also created the Pension Benefit Guaranty Corporation ("PBGC"), "a wholly owned government corporation . . . in order to guarantee the payment of benefits to plan beneficiaries" and made "[t]he PBGC . . . responsible for paying a plan's obligations if the plan terminated with insufficient assets to support its guaranteed benefits"  *Id.*; *see T.I.M.E.-DC, Inc. v. Mgmt.-Lab. Welfare & Pension Funds, of Loc. 1730 Int'l Longshoremen's Ass'n*, 756 F.2d 939, 943 (2d Cir. 1985).

Six years later, in response to concerns that ERISA "failed to adequately protect multiemployer pension plans from the adverse consequences of employer withdrawals, which threatened to result in the collapse of numerous multiemployer plans, forcing PBGC to assume

11

obligations in excess of its capacity," Congress enacted the Multiemployer Pension Plan Amendments Act ("MPPAA"). *Hoeffner v. D'Amato*, No. 09-CV-3160, 2016 WL 8711082, at *2 (E.D.N.Y. Sept. 30, 2016). A "multiemployer plan" under ERISA is any pension plan "to which more than one employer is required to contribute" and "which is maintained pursuant to one or more collective bargaining agreements." 29 U.S.C § 1002(37)(A)(i)-(ii). Employers that contribute to multiemployer plans contribute to a collective pool of assets, which is then invested and distributed to the employees of participating employers when their rights vest – *e.g.*, when they retire or reach a certain age. *See Ganton Techs., Inc. v. Nat'l Indus. Grp. Pension Plan*, 76 F.3d 462, 464 (2d Cir. 1996). The MPPAA "requires an employer that withdraws from a multiemployer plan to pay its proportionate share of the pension plan's unfunded vested benefits, known as withdrawal liability." *UGCW Loc. 174 Pension Fund v. 5600 Market Corp.*, No. 17-CV-5789, 2018 WL 4403394, at *5 (E.D.N.Y. Aug. 16, 2018), *report and recommendation adopted*¸ 2018 WL 4403394 (E.D.N.Y. Sept. 14, 2018).

Part One of Subtitle E of ERISA, 29 U.S.C. §§ 1381-1405, sets forth the rules governing withdrawal liability.[4] Under § 1382, once an employer withdraws from a multiemployer pension plan, the plan sponsor must "(1) determine the amount of the employer's withdrawal liability, (2) notify the employer of the amount of the withdrawal liability, and (3) collect the amount of the withdrawal liability from the employer." 29 U.S.C. § 1382. This process is sometimes referred to as "ERISA's 'pay now, dispute later' rule," and it requires "an employer [to] make immediate payment upon a Fund's demand, regardless of whether it disputes the propriety of the payment." *Nat'l Ret. Fund v. Intercontinental Hotels Grp. Res., LLC*, No.19-CV-8018, 2020 WL 1922755, at *6 (S.D.N.Y. Apr. 20, 2020).

---

[4] The Court refers to ERISA sections by their numbering under Title 29 of the U.S. Code.

"If the employer fails to make the scheduled payments toward its withdrawal liability, the MPPAA establishes procedures by which the . . . fund may bring suit to compel payment." *Langone v. Esernia*, 847 F. Supp. 214, 217 (D. Mass. 1994). "In any action . . . to compel an employer to pay withdrawal liability, any failure of the employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution . . . ." 29 U.S.C. § 1451(b); *see Trs. of the 1199 SEIU Health Care Emps. Pension Fund v. Traymore Chemists, Inc.*, No. 13-CV-4070, 2014 WL 4207589, at *5 (E.D.N.Y. June 25, 2014), *report and recommendation adopted*, 2014 WL 4207592 (E.D.N.Y. Aug. 25, 2014). Section 1132(g)(2)

> sets forth the remedies that shall be awarded in an action to recover delinquent contributions.  Those remedies are the unpaid contributions; the interest on the unpaid contributions; an amount equal to the greater of either the interest on the unpaid contributions or the liquidated damages provided for under the plan in an amount not in excess of 20 percent of the unpaid contributions; reasonable attorneys' fees and costs; and any other relief appropriate.  All of these remedies, combined, comprise the damages to which a fund is statutorily entitled.

*Trs. of the IAM Nat'l Pension Fund v. M & K Emp. Sols., LLC*, No. 20-CV-433, 2022 WL 594539, at *7 (D.D.C. Feb. 28, 2022).  Thus, "if an employer ignores 'pay now, dispute later' and 'refuse[s] to follow the statutory procedure for challenging assessments of withdrawal liability,' it must pay the corresponding penalty:  liquidated damages, interest, costs, and attorneys' fees." *Id.* (alteration in original) (quoting *Cent. States, Se. & Sw. Areas Pension Fund*, 960 F.2d 1339, 1347 (7th Cir. 1992)). "This portion of the damages for a delinquent withdrawal liability claim is separate from the underlying withdrawal liability itself." *Id.*; *see Bd. of Trs. of the United Furniture Pension Fund v. Premier Restoration Techs.*, No. 21-CV-9172, 2022 WL 2312329, at *4 (S.D.N.Y. June 28, 2022) ("[S]eparate from an award of withdrawal liability and interest thereon, ERISA provides for an additional award of interest or an award of liquidated

13

damages not exceeding 20% of the withdrawal liability amount, whichever is greater."), *report and recommendation adopted*, 2022 WL 3294825 (S.D.N.Y. Aug. 11, 2022).

"[Section] 1132(g)(2) remedies apply to all contributions that are unpaid at the time a plan files suit." *Huff v. Cruz Contr. Corp.*, 643 F. Supp. 2d 344, 349 (S.D.N.Y. 2009); *see Operating Eng'rs Loc. 139 Health Benefit Fund v. Gustafson Constr. Corp.*, 258 F.3d 645, 654 (7th Cir. 2001) (collecting cases). Were it otherwise, an employer could "escape its statutory liability for interest, liquidated damages or double interest, attorney fees, and costs simply by paying the delinquent contributions" after being sued but "before entry of judgment," a result that "would largely thwart the purpose of § 1132(g)(2) to provide plan fiduciaries with an effective weapon against delinquent employers." *Iron Workers Dist. Council of W. New York & Vicinity Welfare & Pension Funds v. Hudson Steel Fabricators & Erectors, Inc.*, 68 F.3d 1502, 1506, 1508 (2d Cir. 1995). Accordingly, § 1132(g)(2) "simply directs that once there is a favorable judgment, the plaintiff is entitled to all the measures of relief not already obtained." *Id.* at 1507.

Here, it is undisputed that Ruprecht paid the four remaining quarterly payments required by the Revised Assessment on February 18, 2022, approximately eight and a half months *after* the filing of this action. (*See* Ruprecht 56.1 Resp. ¶¶ 24-31, 35). And it is clear that "an employer who had outstanding unpaid contributions at the time suit was filed [cannot] . . . escape remedies under 29 U.S.C. § 1132(g)(2) by paying off all delinquent contributions owed after suit was filed but prior to judgment." *32BJ N. Pension Fund v. Nutrition Mgmt. Servs. Co.*, 935 F.3d 93, 101 n.13 (2d Cir. 2019). Accordingly, both the plain language of § 1132(g)(2) and Second Circuit precedent mandate that Plaintiffs are entitled to the relief requested here – namely, interest, liquidated damages, and attorneys' fees in connection with Ruprecht's four missed

14

withdrawal liability payments. *See Trs. of Bldg. Serv. 32B-J Health Fund v. Triangle Servs., Inc.*, No. 05-CV-2546, 2006 WL 3408572, at *3 n.13 (S.D.N.Y. Nov. 22, 2006) ("[T]he Court has no discretionary power in this instance" as "both interest and liquidated damages-plus attorneys' fees are mandated under the remedial scheme provided by 29 U.S.C. § 1132(g).").

Defendant's cross-motion for summary judgment attempts to avoid this straightforward application of § 1132(g)(2) by urging the Court to adopt "an equitable exception to the statutory provisions on interim payments" that the Fifth and Seventh Circuits have employed to exempt employers from making interim withdrawal liability payments if a pension plan's claims are frivolous and not colorable. (*See* D's Mem. at 13-16.) But, as Defendant appears to concede, (*see id.* at 14), the Second Circuit has not adopted that equitable exception, and District Courts in this Circuit have rejected identical arguments, *see, e.g.*, *Trs. of Amalgamated Ins. Fund v. Steve Petix Clothier, Inc.*, No. 03-CV-4530, 2004 WL 67480, at *4 (S.D.N.Y. Jan. 15, 2004) (noting that Second Circuit "has not considered" an equitable exception, declining to apply one, and collecting cases); *Trs. of Laundry Dry Cleaning Workers & Allied Ret. Fund Workers United v. Oceanside Int'l Indus.*, No. 16-CV-6194, 2018 WL 1517207, at *3 (S.D.N.Y. Mar. 27, 2018) (rejecting equitable exception as inconsistent with ERISA and noting that defendant does not "cite to any statutory provision or Second Circuit precedent which would lead to a different conclusion"); *see also Findlay Truck Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 726 F.3d 738, 752-53 (6th Cir. 2013) (collecting cases and noting that a significant majority of Circuits have either "not addressed whether an equitable exception to 'pay now, dispute later' may exist" or "have declined to find one" and declining to adopt an equitable exception).

In any event, "[e]ven courts that recognize the equitable exception have cautioned that the exception is limited," and only applies when a claim is not colorable. *Trs. of Amalgamated*

15

*Ins. Fund*, 2004 WL 67480, at *4.  In the context of the MPPAA, a claim is not colorable only if it is "so insubstantial, implausible, or otherwise completely devoid of merit as not to involve a federal controversy," which is "a high burden for . . . defendants to meet."  *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993).  In an attempt to cast the Fund's claims as meritless, Ruprecht focuses on "the Fund's original, unlawful assessment," (D's Mem. at 16), which it alleges "blatantly violat[ed] ERISA," (ECF No. 47("D's Opp.") at 5).

But despite Ruprecht's forceful rhetoric, the Original Assessment is not the subject of this action for missed withdrawal liability payments – the Revised Assessment is.[5]  And Ruprecht does not dispute the accuracy of the Revised Assessment, (*see* Ruprecht 56.1 Stmt. ¶¶ 48-49, 51-52; Ruprecht 56.1 Resp. ¶¶ 21-22), or that the Revised Assessment called for four additional withdrawal liability payments that were only tendered after the instant suit was filed, (*see* Ruprecht 56.1 Resp. ¶¶ 24-31, 35).  Because Ruprecht failed to make those payments as required by "pay now, dispute later," *see Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Zaro Bake Shop, Inc.*, No. 20-CV-9894, 2021 WL 2350094, at *3 (S.D.N.Y. June 8, 2021), the Fund's action to recover them "could not reasonably be considered so completely devoid of merit . . . for the purpose of falling into any prospective equitable exception," *Trs. of the Amalgamated Ins. Fund*, 2004 WL 67480, at *5.  Stated differently, even if this Court were to adopt the equitable exception – and it declines to do so – Ruprecht's claim would still fail

---

[5] It should also be noted that the Second Circuit in *Metz II* hardly held that the Fund "blatantly violat[ed] ERISA," as Ruprecht claims.  (D's Opp. at 5.)  Instead, the Circuit reversed Judge Caproni's determination as to an open legal issue – namely, whether ERISA "require[s] actuaries to calculate withdrawal liability based on interest rate assumptions used prior to an employer's withdrawal from a plan."  *Metz II*, 946 F.3d at 147.

because it has not shown that the Fund's claims concerning the Revised Assessment are

meritless.[6]

---

[6] Ruprecht's papers contain several additional arguments intended to trigger the application of the equitable exception. None pass muster. First, Ruprecht maintains that the Fund is in possession of "approximately $504,000 in excess payments above and beyond the principal in addition to interest, damages, and fees sought by the Fund." (D's Mem. at 12.) To be sure, the Revised Assessment does call for approximately $504,000 in interest, (*see* Ruprecht 56.1 Stmt. ¶¶ 52, 58), but that amount arose at least in part from Ruprecht's decision to pay its withdrawal liability in installments, (*see* Ruprecht 56.1 Resp. ¶¶ 9-10). And irrespective of the interest contemplated by the Revised Assessment, the evidentiary record available to the Court shows that Ruprecht had paid $2,284,440.96 at time this suit was filed, of which $1,801,374.64 represented principal and $483,093.32 represented interest, (*id.* ¶ 32) – *i.e.*, the principal it owed when the Revised Assessment was issued was greater than the principal it had paid as of that time, (*see* Ruprecht 56.1 Stmt. ¶ 52). But even if that were not the case, Ruprecht was obligated to keep paying while it disputed the Revised Assessment, in accordance with "pay now, dispute later." Because it did not do so, the Fund's suit to recover outstanding withdrawal liability pursuant to the Revised Assessment is not frivolous. *See Trs. of Laundry Dry Cleaning Workers*, 2018 WL 1517207, at *2-3.

Ruprecht also contends that it "intend[ed] to pay the withdrawal liability in a lump sum," but was unable to do so because the Original Assessment was "preposterous[ly]" inflated and exceeded the amount it had set aside for that payment. (D's Opp. at 4). While that may be true, Ruprecht has identified no legal authority establishing or even supporting that its intent to pay its withdrawal liability in connection with the Original Assessment in a lump sum somehow insulates it from its "pay now, dispute later" obligations in connection with the Revised Assessment. Similarly, Ruprecht maintains that the Original Assessment is relevant to the instant action because that assessment resulted in "litigation between Ruprecht and the Fund [that] is nearing the eight (8) year mark." (ECF No. 53 ("D's Reply") at 2-3.) But again, Ruprecht does not point to any legal authority establishing that the length of that litigation somehow excuses it from making outstanding withdrawal liability payments in connection with the Revised Assessment.

I understand Ruprecht's frustration. Had the Fund not greatly increased the Original Assessment by retroactive use of the revised interest rates, Ruprecht could have paid the whole amount and would not have owed any interest, and in that sense the Fund received interest it would not have received had it done the calculation the way the Second Circuit ultimately determined it should have. And had the Fund used the proper rates, years of litigation could have been avoided. But none of that changes the fact that Ruprecht was obligated to "pay now" the four remaining payments due under the Revised Assessment. *See Nat'l Shopmen Pension Fund v. DISA Indus., Inc.*, 653 F.3d 573, 581 (7th Cir. 2011) ("[W]hen a plan revises its assessment of withdrawal liability, the MPPAA compels the employer to comply with the revised assessment as if it were an original assessment and follow the standard statutory procedures for review."). It plainly failed to do so and cannot avoid its payment obligations

17

At bottom, and as Ruprecht ordinarily "would agree," "a multi-employer pension fund is entitled to summary judgement in a collection action for delinquent withdrawal liability when the fund has (i) determined a withdrawal occurred, (ii) calculated the employer's withdrawal liability, (iii) notified the employer of the withdrawal liability amount and payment schedule, and (iv) demanded payment." (D's Opp. at 2-3.) Here, the Fund has shown that it has taken those steps in connection with the Revised Assessment, and Ruprecht has failed to raise any issues of material fact that controvert that showing. Therefore, the Fund is entitled to summary judgment, including interest, liquidated damages and reasonable attorneys' fees and costs. *See UNITE Nat'l Ret. Fund. v. Veranda Mktg. Co.*, No. 04-CV-9869, 2009 WL 2025163, at *4 (S.D.N.Y. July 13, 2009) ("In any action to collect withdrawal liability 'in which a judgment in favor of the plan is awarded, the court shall award the plan' . . . reasonable attorneys' fees and costs, interest, and liquidated damages. Such award is a mandatory remedy.") (quoting 29 U.S.C. § 1132(g)(2)(B)).

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion is GRANTED and Defendant's cross-motion is DENIED. Plaintiffs are ordered to confer with Defendant and to submit a proposed judgment, including interest, liquidated damages, and reasonable attorneys' fees and costs – limited to fees and costs incurred during the course of the instant litigation – within ten days of

---

pursuant to the Revised Assessment by pointing to the impropriety of the Original Assessment or the duration of the litigation it engendered.

the entry of this Decision. If the parties cannot agree on the amounts, Defendant shall file any objections thereto within ten days thereafter, and Plaintiffs may reply seven days after that.

**SO ORDERED.**

Dated: June 21, 2023
      White Plains, New York

                                              _____
                                              CATHY SEIBEL, U.S.D.J.